IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| | ) | 2:14-cr-00135 |
| v. | ) | |
| | ) | |
| GARY BUTLER, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER OF COURT

Defendant, Gary Butler, is charged in counts one and three of a three-count indictment with conspiracy to distribute and possess with intent to distribute 100 grams or more of heroin and possession with intent to distribute a quantity of heroin. The charges stem from Butler's arrest on May 7, 2014, outside an apartment building where his co-defendant, Harry Simpson, rented an apartment. Pending before the Court is Butler's MOTION TO SUPPRESS PHYSICAL EVIDENCE (ECF No. 33), in which he seeks to suppress the heroin seized from the rental vehicle he was driving on the day of his arrest. On November 12, 2014, the government filed a response to the motion (ECF No. 52). On November 25, 2014, the Court held a hearing with respect to the motion, after which both the Defendant and the government filed additional briefs (ECF Nos. 60, 61, 66, 68). Accordingly, the motion is ripe for disposition.

I.     **Findings of Fact**

The government called one witness to testify at the suppression hearing: Matthew Maritz, a Robinson Township police officer and member of the Drug Enforcement Administration's ("DEA") Interdiction Group Task Force. Officer Maritz has been assigned to the Task Force for approximately four years, and as part of his duties, he works long-term drug investigations and also does drug interdiction work. Butler also briefly testified at the hearing. Based on the testimony and evidence presented at the suppression hearing, the Court makes the following

1

findings of fact.

On May 7, 2014, Officer Maritz was part of a team of Task Force officers involved in executing a search warrant on an apartment located at 1110 Overland Avenue, Duquesne, Pennsylvania (the "apartment building"). The apartment building is two stories high and contains multiple units. A walkway leads from the sidewalk in front of the apartment building to the front door. Officer Maritz was aware that the target unit inside the apartment building was leased by Simpson and that a large quantity of heroin was suspected to be inside.[1] He also knew that Simpson drove a black Lincoln with Ohio plates.

Officer Maritz and the other Task Force officers arrived at the apartment building at approximately 12:30 p.m. – before the search warrant had actually been issued by the magistrate judge. Upon arrival, they set up surveillance on the apartment building and the street directly in front of it. Officer Maritz was positioned on the same side of the street as the apartment building, approximately two or three blocks away. He was using binoculars to scan the area, and he was in contact via radio with the other Task Force officers involved in executing the search warrant.

Whenever Officer Maritz arrived, Simpson's black Lincoln was not parked outside the apartment building. Eventually, however, Officer Maritz observed Simpson pull up and park the black Lincoln on the same side of the street as the apartment building. He then exited the vehicle. Around the same time, Officer Maritz observed a silver Nissan Juke, whose driver was later identified as Butler, arrive on the scene and park directly across the street from the apartment building. Officer Maritz had never seen Butler before, and, at the time, Butler was not a subject of the Task Force's investigation. According to a rental agreement later recovered from inside the Nissan, the vehicle was rented from Enterprise Rental Company. The rental agreement listed

---

1. It was not established at the suppression hearing whether Simpson, or anyone else, lived in the apartment or whether it was used solely as a "stash house."

Monika Banks as the renter, and no other authorized drivers were listed on the agreement.

Shortly after he arrived outside the apartment building, Butler exited the Nissan and walked across the street towards Simpson. Simpson and Butler shook hands and then walked towards the trunk of the black Lincoln, where they were joined by two unidentified men who had been standing outside the apartment building whenever Officer Maritz arrived. Simpson opened the trunk of the black Lincoln, and the four men were seen "passing out" yellow bags.[2] Simpson and Butler then walked towards the apartment building, while the other two men left the area. At the time, Simpson was carrying a yellow bag, and Officer Maritz believed that Butler was holding a yellow bag as well.

Officer Maritz could not see whether Simpson and Butler actually entered the apartment building from his vantage point. He could not see the entrance to the apartment building or the walkway leading to the entrance of the apartment building;[3] his view was limited to the street and sidewalk in front of the building. Furthermore, none of the other Task Force officers on the scene relayed to Officer Maritz that they had seen Simpson and Butler actually enter the apartment building. Nevertheless, Officer Maritz assumed that Simpson and Butler had entered

---

2. Butler argues that "Officer Maritz never testified that he saw Butler either receiving a yellow bag from or giving a yellow bag to any of the other individuals." Def.'s Reply Br. at 1, ECF No. 67. That is true. As Officer Maritz testified, "[i]t looked like they were passing out bags, yellow bags." Hr'g Tr. at 11, ECF No. 58. But Officer Maritz's other testimony makes clear that he did observe Butler carrying a yellow bag, which necessarily suggests that he did receive the bag from someone since he was not holding a bag whenever he exited the Nissan.

3. At the suppression hearing, Butler introduced an image of the apartment building taken from Google's "Streetview" program, "a feature on Google Maps that offers free access on the Internet to panoramic, navigable views of streets in and around major cities across the United States." *Boring v. Google Inc.*, 362 F. App'x 273, 276 (3d Cir. 2010) (internal footnote omitted). The image shows that there is a walkway leading from the front door of the apartment building to the sidewalk. There is a tree to the right of the walkway, which likely would have somewhat obstructed Officer Maritz's view of the door of the apartment building. Officer Maritz testified the tree did not appear as large at the time of Butler's arrest as it does in the image from Google, however. Hr'g Tr. at 23:11-14, ECF No. 58.

the apartment building.

Approximately five to six minutes later, Simpson and Butler walked back into Officer Maritz's field of vision, away from the apartment building back towards the street. Butler reentered Officer Maritz's field of vision whenever he reached the sidewalk in front of the building, and at this time, he was holding a yellow plastic shopping bag, possibly the same bag he had been seen with earlier. Butler continued across the street to the silver Nissan, opened the passenger side door, and placed the yellow bag in the passenger side of the vehicle. While standing near the Nissan, Butler had a brief conversation with Simpson, who was standing across the street, before getting into the driver's seat of the Nissan. Around the same time, Simpson got behind the wheel of his black Lincoln.

Meanwhile, Officer Martiz was relaying his observations to the other Task Force officers over his radio. Just as Butler started to drive away, F.B.I. Special Agent Alex Shiraj gave a command to take Simpson and Butler down. The decision was made because the officers believed Simpson and Butler were leaving the area and that Butler had heroin in his vehicle. After receiving the command from Special Agent Shiraj, Officer Maritz drove up behind Butler's vehicle with his red and blue emergency lights flashing, while his partner, Officer Stewart, approached from the front of the vehicle with his emergency lights flashing. The officers exited their vehicles with guns drawn and approached Butler's vehicle, announcing that they were police officers. Officer Maritz's gun was pointed at Butler as he approached. The officers ordered Butler to stop the vehicle two or three times before Butler complied. Once Butler stopped the vehicle, Officer Maritz opened the door and removed Butler from inside, placing him on the ground at gun point and cuffing his hands behind his back.

After waiting a few minutes for additional officers to arrive on the scene, Officer Maritz

entered Simpson's apartment, along with Officer Stewart and Special Agent Shiraj. Once inside, they observed a large amount of heroin and packaging materials, stampers, glassine baggies, and rubber bands scattered on a table. Two women were also discovered inside the apartment, and they were detained and Mirandized.

Officer Maritz spent approximately two or three minutes inside the apartment, and then went back outside. After leaving the apartment, Officer Maritz gave *Miranda* warnings to Simpson, who was handcuffed on the ground by his black Lincoln. He then walked across the street to where Butler was sitting on the ground in handcuffs outside the Nissan and administered *Miranda* warnings to him. From the time Butler was stopped until the time he was Mirandized, approximately 10 minutes elapsed. Sometime later, a canine unit arrived at the scene.[4] When police searched the silver Nissan, they discovered an amount heroin in the front passenger side of the vehicle.[5]

**II.    Discussion**

Butler argues that he was unlawfully arrested whenever he was stopped outside of the apartment building, and that the evidence eventually seized from the vehicle must be suppressed

---

4.    Presumably, the canine positively alerted to the presence of drugs in the vehicle. This was never established through evidence or testimony at the evidentiary hearing, though. Therefore, the Court cannot say for certain whether it actually happened.

5.    The timing of drug sniffing dog's arrival and the search of the vehicle was never definitively established at the suppression hearing. Officer Maritz testified that the vehicle was searched by Officer Stewart within a couple of minutes of Butler's arrest. On the other hand, Butler testified that he was handcuffed on the ground outside of the rental vehicle for at least over an hour before the canine unit arrived and the vehicle was searched. He also testified that the canine officer was the first officer to enter the vehicle. Ultimately, however, the amount of time Butler spent in handcuffs on the ground outside the vehicle is not material because the government concedes that, even if Butler was in handcuffs for over an hour, he was under arrest that whole time, and there was probable cause for that arrest.

as the fruit of his unlawful arrest.[6] "Fourth Amendment analysis typically proceeds in three stages." *United States v. Dupree*, 617 F.3d 724, 730 (3d Cir. 2010). First, it must be determined "whether a Fourth Amendment event, such as a search or seizure has occurred" – and if so, when. *Id.* (citation omitted). Next, the Court must "consider whether that search or seizure was reasonable." *Id.* Third, if the search or seizure was not reasonable, the Court must "then determine whether the circumstances warrant suppression of the evidence." *Id.* (citation omitted).

    A.    **When was Butler Arrested?**

Butler and the government do not dispute that, at some point on May 7, 2014, Butler was arrested. They do, however, dispute whether the initial encounter with Butler was an investigatory stop under *Terry v. Ohio*, 392 U.S. 1 (1968), requiring only reasonable suspicion, or a *de facto* arrest, requiring probable cause, *see United States v. Johnson*, 592 F.3d 442, 447 (3d Cir. 2010). Butler argues that by blocking the rental vehicle, exiting their cars with guns drawn and pointed at him, physically removing him from the vehicle, placing him on the ground, and handcuffing him, the police officers, in effect, arrested him and did so without probable cause, thereby violating the Fourth Amendment.

The government's position has been somewhat of a moving target. Initially, the government failed to address the issue of when the arrest took place, focusing instead on whether

---

6.     In its initial response to Butler's motion, the government's only argument was that Butler lacked standing to challenge the seizure of evidence from the rental vehicle, inasmuch as he was not listed as an authorized driver on the rental agreement. Butler concedes that he did not have a reasonable expectation of privacy in the rental vehicle and thus lacked standing to challenge the search. According to him, however, that is beside the point. The Court agrees. Even though Butler may lack standing to challenge the search of the vehicle, he has standing to claim that his arrest was unlawful and seek to suppress the evidence seized in the vehicle as the fruit of that allegedly unlawful arrest. *See United States v. Mosley*, 454 F.3d 249, 253 (3d Cir. 2006) (explaining that "passengers in an illegally stopped vehicle have 'standing' to object to the stop, and may seek to suppress the evidentiary fruits of that illegal seizure under the fruit of the poisonous tree doctrine[.]"); *United States v. Starks*, 769 F.3d 83, 89 (1st Cir. 2014) (concluding that defendant had standing to challenge traffic stop of the rental car that he was driving, even though he was an unlicensed, unauthorized driver).

6

Butler has standing. Then at the suppression hearing, the government seemingly conceded that Butler was arrested when he was removed from the vehicle at gun point and placed in handcuffs on the ground. *See* Hr'g Tr. at 36:13-14, ECF No. 58 (explaining that Butler was "arrested at the time he is pulled over . . ."); 36:20-21 (concurring with the Court's statement that Butler "was arrested after he came out of the apartment building and went to his car with the bag" by stating "[r]ight, and that's when law enforcement moved in at that time. That's when they arrested him"); 38:11-12 (stating that "[i]t's the government's position he was under arrest that entire time . . ."); 40:4-7 ("So, as I understand the testimony, Mr. Butler exited the apartment, went to his car, they moved in and detained him. We'll concede he was under arrest at that time."); 40-15-17 ("It's our position that they had probable cause to arrest him at the time that they removed him from the vehicle. We'll concede he was under arrest at that time."). Now, the government is retreating from its apparent concession, claiming that the Assistant United States Attorney ("AUSA") "misspoke" at the hearing and that, in actuality, she did not intend to concede anything. Govt.'s Resp. at 1, ECF No. 66. The government's current position is that Butler was subject to an investigatory detention, for which only reasonable suspicion was required, until Officer Maritz gave him his *Miranda* warnings, at which point he was under arrest, and by which time probable cause had developed. To be fair, the government also took this position at the hearing, though, as noted, the AUSA's statements were far from consistent on this point.

No matter whether the government did, in fact, concede this point at the suppression hearing, its "initial concessions did not bar it from raising the issue" in its post-hearing briefs. *United States v. Rosales-Velasquez*, 899 F.2d 1226, at *3 (9th Cir. 1990) (unpublished). Nor would this Court even be bound by the government's concession. *See United States v. Marino*, 682 F.2d 449, 455 (3d Cir. 1982); *United States v. Smith*, 621 F.2d 483, 489 (2d Cir. 1980);

7

*United States v. Ogles*, 440 F.3d 1095, 1099 (9th Cir. 2006). Instead, the Court must independently determine whether the officers' initial contact with Butler amounted to an arrest.

In *Terry*, the Supreme Court "held that an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30). What begins as a valid *Terry* stop, however, can sometimes transform into a *de facto* arrest, which must be supported by probable cause. To determine whether a *Terry* stop has ripened into an arrest, the Court must "assess 'the reasonableness of the intrusion . . . , balancing the need of law enforcement officials against the burden on the affected citizens and considering the relation of the policeman's actions to his reason for stopping the suspect.'" *United States v. Goode*, 309 F. App'x 651, 653 (3d Cir. 2009) (quoting *Baker v. Monroe Twp.*, 50 F.3d 1186, 1192 (3d Cir. 1995)). This is obviously not a bright-line test. *See Brown v. City of Philadelphia*, CIV. A. 07–0192, 2008 WL 269495, at *7 (E.D. Pa. Jan. 29, 2008) ("The line between a proper *Terry* stop and an improper *de facto* arrest is elusive and not easily drawn."). "The vast majority of courts," however, "have held that police actions in blocking a suspect's vehicle and approaching with weapons ready, and even drawn, does not constitute an arrest per se." *United States v. Edwards*, 53 F.3d 616, 619 (3d Cir. 1995) (citations omitted). "Nor does placing a suspect in handcuffs while securing a location or conducting an investigation automatically transform an otherwise-valid *Terry* stop into a full-blown arrest." *Johnson*, 592 F.3d at 448 (citing *Baker*, 50 F.3d at 1193; *Torres v. United States*, 200 F.3d 179, 185 (3d Cir. 1999)).

Nevertheless, although these actions might not automatically transmute a *Terry* stop into an arrest, there must be some reason for the police to resort to such measures. *See Baker*, 50 F.3d

at 1193 (explaining that the "use of guns and handcuffs must be justified by the circumstances . . ."); *Johnson*, 592 F.3d at 452-53 (noting that "the use of guns and handcuffs must be justified by the circumstances that authorize an investigative detention in the first place") (internal citation and quotation marks omitted). In *Johnson*, for example, the Court of Appeals for the Third Circuit held that the police officers were justified in blocking the defendant's vehicle, drawing their weapons, and eventually handcuffing the vehicle's occupants because "the occupants had been involved in a physical altercation and shooting just minutes before," thereby giving the officers reasonable suspicion that the occupants were armed and dangerous. *Johnson*, 592 F.3d at 453. Likewise, in *United States v. Coker*, 223 F. App'x 136, 141 (3d Cir. 2007), the Court of Appeals held that the officers acted justifiably in blocking a car, jumping on the hood with guns drawn, handcuffing the defendants, and removing them from the vehicle, inasmuch as the defendants had been involved in a shootout earlier in the day and were reaching toward the floor of the car as the officers approached. Accordingly, the court concluded, the officers' actions "did not turn an investigatory stop into an arrest." *Id.*

By contrast, in *United States v. Ceballos* – the primary case on which Butler relies – the Second Circuit Court of Appeals held that the officers' actions in blocking the defendant's car and approaching with guns drawn was tantamount to an arrest because "the officers articulated no facts which they viewed as creating a need for the use of force and a degree of intrusion beyond that generally employed in *Terry* stops." 654 F.2d 177, 183 (2d Cir. 1981). Rejecting the government's argument that the intrusion was justified by the nature of the suspected offense, the officers' fear for their personal safety, and the chance that the defendant might flee, the court explained:

> [the defendant] was completely unknown to the officers, was not reputed to be a major narcotics violator, was not known to be armed or reasonably suspected of

9

> being armed, did not engage in erratic driving designed to avoid surveillance, and
> did not otherwise act in a way that would lead the officers reasonably to conclude
> that the degree of force here was required to effect a *Terry* stop. Rather, based on
> the fact that [the defendant] entered a three family building at 11:00 p.m., exited 5
> to 10 minutes later carrying a small paper bag, looked up and down the block "in
> a curious manner" and was Hispanic . . . , he was subjected to an intrusion which,
> although not technically an arrest, was sufficiently akin to a traditional arrest to
> require probable cause.

*Id.* at 184.

The Court is persuaded by the Second Circuit Court of Appeal's reasoning in *Ceballos*, and finds that reasoning applicable here. Just like the officers in *Ceballos*, Officer Maritz and Officer Stewart had no specific reason to believe that their actions were necessary under the circumstances. Prior to the date in question, Butler was not a suspected drug dealer. In fact, he was completely unknown to the officers, and there was no particular reason to think that he was armed and dangerous. The Court recognizes that "narcotics traffickers are often armed and violent" but "that generalization, without more, is insufficient to justify the extensive intrusion which occurred in this case." *Id.*[7] Moreover, once the officers moved upon the vehicle, Butler did not make any furtive movements or otherwise suggest that he may have posed a threat to officer safety or the general public. While Butler may have briefly attempted to drive away when Officer Maritz first announced his presence, this, alone, did not justify the degree of the intrusion imposed by the officers. Indeed, the officers could have avoided this issue altogether by approaching Butler on the street before he entered the vehicle once their suspicions were

---

7. The government relies on *Goode*, 309 F. App'x at 653, to support its contention that the officers were justified in approaching Butler with their guns drawn and removing Butler from the vehicle, based solely on their belief that he was involved in drug dealing. Although the Court of Appeals did acknowledge in *Goode* that guns are drugs are typically associated, the government ignores that that was not the sole reason the Court of Appeals found that the officers were justified in removing the defendant from his car. In addition to that factor, the Court of Appeals also noted that the defendant was believed to be the gunman in an unrelated shooting, which, according to the Court of Appeals, gave the officers "good reason to immediately put [him] in handcuffs, for the protection of the police and the protection of the community." *Id.* at 654. To reiterate, there are no such facts in this case.

aroused. *See id.* ("[T]he fact that Ceballos was in an automobile does not justify the intrusiveness of the tactics utilized here; for all that appears he could have been stopped on the street before he entered his car."). Accordingly, based on a review of the totality of the circumstances, the Court concludes that Butler was arrested whenever he was removed from the rental vehicle at gun point and placed in handcuffs on the ground outside of the vehicle.[8]

### B. Was there Probable Cause to Arrest Butler?

Having determined that Butler was under arrest whenever the officers approached with guns drawn and he was removed from the vehicle and placed on the ground in handcuffs, the Court must now decide whether there was probable cause to believe that Butler was committing or had committed a crime prior to his arrest.

When the validity of an arrest is challenged, it is the task of the district court to resolve "whether the facts available to the officers at the moment of the arrest" amounted to probable cause. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Probable cause is "a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (internal quotation and citation omitted). It exists whenever "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed [by the person to be arrested]." *Dunaway v. New York*, 442 U.S. 200,

---

8. This conclusion is bolstered by the government's statement that Butler was under arrest whenever he was Mirandized, just a few minutes after he was removed from the vehicle. As Butler aptly observes, there is no reason to conclude that Butler was not under arrest whenever he was removed from the vehicle, but was under arrest just minutes later whenever he was Mirandized. Whether a person has been received *Miranda* warnings is just a factor in determining whether he was under arrest; it is not the *sine qua non* of an arrest. Moreover, although Officer Maritz may have believed that Butler was not under arrest until he was *Mirandized*, his subjective belief is not dispositive. *See United States v. Jackson*, 652 F.2d 244, 250 (2d Cir. 1981); *United States v. Serna-Barreto*, 842 F.2d 965, 968 (7th Cir. 1988).

208 n.9 (1979) (internal citation and quotation marks omitted) (brackets in original). "[T]his standard 'requires more than mere suspicion; however, it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt.'" *United States v. Burton*, 288 F.3d 91, 98 (3d Cir. 2002) (quoting *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482–83 (3d Cir. 1995)). Moreover, as the Supreme Court has made clear, probable cause must exist as to the particular person searched or seized. *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). "[A] person's mere propinquity to others independently suspected for criminal activity does not, without more, give rise to probable cause to search [or seize] that person." *Id.*

The government has failed to establish that there was probable cause to believe that Butler was committing or had committed a crime at the time he was arrested. As already discussed, prior to the arrest, Officer Maritz did not know who Butler was: he was not a subject of the investigation of Simpson's suspected drug dealing and he had no connection to the apartment about to be searched for heroin. Furthermore, Butler was not observed making any suspicious movements or attempting to conceal anything from anyone. The Court also cannot ignore that Butler was never actually seen entering the apartment building or the particular unit for which there was a search warrant. As Officer Maritz testified, he just assumed that Butler did so. However, from his vantage point two to three blocks away, he could not verify his assumption, and none of his fellow task force members could either.

Rather, the evidence adduced at the suppression hearing established only that Butler was present outside the apartment building with Simpson with a yellow shopping bag in hand, which had been "passed out" behind Simpson's black Lincoln. While it is not disputed that there was probable cause to search Simpson's apartment, Butler's presence near the place where the warrant was to be executed and his proximity to and potential relationship with Simpson was

12

insufficient to establish probable cause to arrest Butler. *See, e.g.*, *United States v. Ingrao*, 897 F.2d 860, 863-64 (7th Cir. 1990) (finding that the police lacked probable cause to arrest the defendant who was seen standing in the gangway between two homes, one of which was the subject of a drug investigation, where the defendant was not actually seen exiting that house); *United States v. Robertson*, 833 F.2d 777, 782-83 (9th Cir. 1987) (holding that police lacked probable cause to arrest a woman seen walking out of a suspected meth lab where there was no indication that she was involved criminal activity). Moreover, while the presence of the shopping bag and the actions of the four men behind the black Lincoln "passing out" said bags arguably could have aroused some suspicions, these facts alone did "not provide an 'objective basis' from which it can be reasonably concluded that a narcotics offense [was] being committed." *Ceballos*, 654 F.2d at 185 (citation omitted). Notably, there was no testimony about what the bags looked like – i.e., whether they appeared to be filled or whether they appeared to be empty.

Even if the Court were to assume that Butler did briefly enter Simpson's apartment, this does not add much to the probable cause equation. To be sure, as the government argues, drug dealers rarely invite innocent people inside their homes to witness their drug dealing operations. But in this case, "the short duration of a visit without more facts than were known to the agents here" is not be enough "provide probable cause for arrest." *Id.* (finding no probable cause to arrest defendant who entered the house of a suspected drug dealer, left five to 10 minutes later with a paper bag, "looked up and down the street 'in a curious manner' and was Hispanic"). Whenever Butler was arrested, Officer Maritz had no way of knowing what happened inside the apartment or whether the apartment actually contained heroin or other damaging evidence and, if so, whether the heroin or other evidence was in plain view. For all Officer Maritz knew at the time of Butler's arrest, the drugs and paraphernalia could have been stashed away somewhere

inside the apartment out of the view of any occupants. It was only after Officer Maritz entered the apartment that he learned that drugs and other incriminating materials were sitting out on a table, and by that point, Butler had already been arrested. Thus, from Officer Maritz's perspective, Butler's presence inside the apartment would not necessarily mean that he knew or should have known that drugs were present, such that the officer could have reasonably suspected that Butler was more than just a bystander. *Compare United States v. Holder*, 990 F.2d 1327, 1329 (D.C. Cir. 1993) (explaining that defendant's proximity to drugs that were openly on display in apartment where he was arrested "reflected his knowledge of, and probably his involvement in, narcotics activity"). And as already noted, "probable cause determinations must be evaluated according to the information the police knew at the moment of the challenged conduct, not information learned for the first time afterwards." *Peet v. City of Detroit*, 502 F.3d 557, 565 (6th Cir. 2007) (citing *Beck*, 379 U.S. at 91).

While the government acknowledges that a person's "mere propinquity" to others suspected to be involved in wrongdoing is not enough to establish probable cause, it argues that something more has been shown in this case. In support of this argument, the government relies primarily on *United States v. Reyes*, 225 F.3d 71, 73 (1st Cir. 2000). The facts known to the officers in *Reyes*, however, presented a far stronger case for probable cause than those here. The officers saw Reyes sitting in the passenger seat of a pick-up that pulled into the driveway of a house belonging to a suspected drug dealer, a week after officers observed a suspected drug transaction take place at the same house. *Id.* at 73. Once the pick-up parked, the driver got out and pulled something out from underneath the truck before going inside the house. *Id.* Meanwhile, Reyes stayed in the cab. *Id.* The driver then returned to the truck, got inside, and looked around until the house's owner (i.e., the suspected dealer) pulled up in his own car. *Id.*

14

Then all three occupants of the truck, including Reyes, went inside the house accompanied by the dealer. *Id.* When the three men returned to the truck just minutes later, the driver was seen stashing something back underneath the truck, while Reyes was sitting in the cab just feet away, facing the direction of the driver. *Id.* at 73-74. Distinguishing these facts from "mere propinquity" cases like *Ybarra*, the First Circuit concluded that Reyes's "presence during and participation in such suspicious activities as the orchestrated entrances into and exits from the house, and the minutes spent in the truck looking around, were neither innocent nor ignorant." *Id.* at 76. The court also found it "especially compelling . . . that the driver of the pickup truck stood in front of the vehicle and reached under it, in a way consistent with prior suspected drug activity observed by [police] at the [house], while appellant was sitting in the cab not more than four or five feet away and facing in that direction." *Id.* By contrast, the officers in this case never actually saw Butler enter the apartment building and even if they did, that would not be enough to establish probable cause for the reasons set forth above. Nor did the officers observe Butler or anyone else engaging in suspicious activity akin to that in *Reyes*.

The government also relies on *Burton*, 288 F.3d at 91, in an attempt to show that this case is unlike the "mere propinquity" line of cases. Although, at first blush, *Burton*'s facts seem similar to those here, there are also critical distinctions, which diminish its persuasive force. In *Burton*, a confidential informant actually observed "what appeared to be a major drug transaction between [a suspected drug dealer] and Burton" inside a suspected drug dealer's house, while equipped with a microphone and relaying his observations to the police who were conducting surveillance outside the house. *Id.* at 94. Whenever the informant came to the house in an attempt to buy drugs, he was denied entry and told that the suspected dealer was doing business inside. *Id.* During this encounter, the informant was able to see inside the house and observed

15

stacks of money being counted and two men – one later identified as Burton – meeting with the dealer. *Id.* After a long wait outside the house, during which the informant was told by others that a deal was going down inside, the informant was allowed inside, where he was able to arrange a deal for himself. *Id.* at 95. Shortly thereafter, officers in a surveillance van outside the house saw the defendant exit with a bag in hand, which he placed in the trunk of his car before driving away. *Id.* A subsequent search of the car pursuant to a warrant uncovered a large quantity of cash and a firearm in the trunk. *Id.* What distinguishes this case from *Burton* is the fact that Butler was never actually seen inside the apartment, let alone actually engaging in a "major drug transaction" or standing nearby while wads of cash were counted. Even if the Court assumes that Butler went inside, there is no evidence that the officers knew what was going on inside the house while he was inside, which is a far cry from the eyewitness testimony the police were able to rely upon in *Burton*.

In sum, the Court concludes that the facts known to Officer Maritz and the other Task Force officers were insufficient to lead a reasonable observer to believe that Butler was committing or had committed a crime at the time he was arrested. Even "view[ing] these facts through the lens of the Task Force's significant experience," they were not enough to arrest Butler. *Id.* at 99 (citation omitted). At most, the facts were such that a brief, investigatory stop – one involving a lesser degree of intrusion than that which actually occurred here – should have been made or additional surveillance should have been conducted to confirm or dispel the officers' suspicion. Accordingly, because Butler was arrested without probable cause, the arrest was unlawful under the Fourth Amendment.

**C.     Is Suppression of the Evidence Warranted?**

"[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of

16

an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *Segura v. United States*, 468 U.S. 796, 804 (1984) (internal citations omitted). Evidence is not the "'fruit of the poisonous tree,'" however, "simply because it would not have come to light but for the illegal actions of the police." *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963). Rather, the Supreme Court has held that "the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which [an] objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 488 (internal citation and quotation omitted).

The government has not offered any argument as to why the heroin seized from the vehicle should not be considered the fruit of Butler's unlawful arrest. In fact, the AUSA acknowledged at the suppression hearing that "the government should show that there was probable cause to arrest [Butler] because his arrest kind of led to the search of his vehicle. If he wasn't detained and arrested, his vehicle would never have been searched." Hr'g Tr. at 5:9-13, ECF No. 58. The Court agrees and finds that there is a sufficient causal relationship between the arrest of Butler and the evidence to trigger the fruit-of-the-poisonous tree doctrine. *Cf. Mosley*, 454 F.3d at 269 (holding that "when a vehicle is illegally stopped by the police, no evidence found during the stop may be used by the government against any occupant of the vehicle unless the government can show that the taint of the illegal stop was purged").

"To overcome [Butler's] suppression motion, therefore, the government would have had to establish one of the traditional exceptions to the *Wong Sun* rule: attenuation, inevitable discovery, independent source, or some intervening act or event sufficient to purge the taint of the illegal [arrest]." *Id.* at 269. The government has not, however, advanced an argument as to

the applicability of any of these exceptions. As a result, the Court is left to conclude that the exclusionary rule applies, and the heroin seized from the vehicle Butler was driving on May 7, 2014, must be suppressed as the fruit of his unlawful arrest.

## III. Conclusion

For the foregoing reasons, Butler's MOTION TO SUPPRESS PHYSICAL EVIDENCE will be **GRANTED**. An appropriate order follows.

McVerry, S.J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) 2:14-cr-00135 |
| v. | ) |
| | ) |
| GARY BUTLER, | ) |
| Defendant. | ) |

## ORDER OF COURT

**AND NOW**, this 23rd day of February, 2015, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that Defendant Gary Butler's MOTION TO SUPPRESS PHYSICAL EVIDENCE (ECF No. 33) is **GRANTED**. A status conference, at which Defendant shall appear, is hereby **SCHEDULED** for **March 9, 2015, at 9:30 a.m.**

BY THE COURT:

s/ Terrence F. McVerry
Senior United States District Court Judge

cc: Lee Markovitz, Esq.
Email: leethelawyer@gmail.com

Katherine A. King, Esq.
Email: katherine.king@usdoj.gov

(via CM/ECF)